## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**ALCHEM INCORPORATED**,

       *Plaintiff*,

    v.

**TAYLOR CAGE, *et al*.**,

       *Defendants*.

**Case No. 2:20-cv-03142-JDW**

### <u>MEMORANDUM</u>

There are things that you guess and things that you know. Only the latter can get you past summary judgment. In this case, Alchem USA Inc. knows that its former salesperson—and self-proclaimed "Nicotine Queen"—Terianne T. Cage, lured away some of its customers when she went to work for a competitor, North America Nicotine Inc. But Alchem can only guess how Ms. Cage solicited those customers and what information she used to do it, including whether she shared any of that information with NAN. As a result, Alchem bases many of its claims on assumptions about what Alchem believes must have happened between NAN and Ms. Cage and between Ms. Cage and customers. But no matter how much Alchem believes the narrative it has crafted, it cannot overcome summary judgment based on a hunch. It needs evidence, and without it, the Court must grant summary judgment on Alchem's claims for misappropriation of trade secrets, unauthorized access of a computer, and tortious interference with a contract.

I.    **BACKGROUND**

A.    **Factual History**

Alchem sells and markets liquid nicotine under the brand name "Nicselect." Ms. Cage worked for Alchem as a Sales and Marketing Manager. Alchem provided Ms. Cage with a company-issued cellphone and laptop computer so that she could perform her job duties. On June 19, 2018, Ms. Cage executed a Confidentiality & Nondisclosure Agreement with Alchem (the "NDA") that prohibited her from disclosing Alchem's trade secrets and other confidential, proprietary information including:

> [I]nformation regarding business plans, manufacturing methods, products, ingredients, chemicals, formulations, applications, procedures, processes, information regarding current or prospective customers or suppliers, and/or other information which is presently being maintained as a trade secret, and other confidential and proprietary financial data, customer data, marketing plans, supply information, and future products.

(ECF No. 37-1 at 1.) The NDA also prohibited Ms. Cage from using this information without Alchem's consent. Ms. Cage also agreed to a Terms And Condition Agreement (the "TCA") that incorporated by reference the terms of an Employee Handbook. That handbook included similar confidentiality obligations that prohibited Ms. Cage from using or disclosing Alchem's confidential information including:

> [B]usiness plans, strategies, budgets, projections, forecasts, financial and operating information, business contracts, databases, financial and account numbers, HIPAA protected medical information, customer and vendor information, advertising and marketing plans, proposals, training materials and methods, and other information not available to the public.

(ECF No. 37-3 at 16.)

2

Alchem utilizes a customer relationship management platform called "Salesforce." The Salesforce database contains information such as current and prospective customer lists, customer contact information (including specific contact information for purchasers and/or decisionmakers), and customers' order and pricing histories. According to Alchem, much of this information "is not generally known to or discoverable by the public." (ECF 98-5 at ¶ 20; ECF No. 98-7 at ¶¶ 11-13, 22-23.) As a result, the Salesforce database would be valuable to competitors in the liquid nicotine industry. Though Ms. Cage could access Salesforce on both her cellphone and laptop, she contends that she "did not like" Salesforce and "rarely accessed it" during her employment. (ECF No. 95-7 at ¶ 3.) Instead, she kept customers' contact information in her phone and kept spreadsheets that identified contacts that she planned to contact at various times. Alchem was aware that Ms. Cage had a tendency to take her communications with customers and prospective clients "off-platform" and that she would connect with them over social media. (ECF No. 98-5 at ¶ 16.)

Like Alchem, NAN sells liquid nicotine. In February 2019, Ms. Cage met NAN's CEO Kevin Burd at an industry trade show. About a month later, Ms. Cage met with Mr. Burd about working for NAN. During their discussions, Ms. Cage indicated that she would reach out to Alchem's customers to see if they would be willing to switch to NAN. NAN did not know that Ms. Cage was subject to any nondisclosure agreements with Alchem. NAN

agreed to pay Ms. Cage a commission for sales to customers that were new to NAN, *i.e.*, that had not purchased from NAN before.

On March 27, 2019, NAN hired Ms. Cage as a sales consultant and advised her that she would need to resign from Alchem. Ms. Cage did not resign from Alchem until April 8, 2019. During the time period between being hired by NAN and resigning from Alchem, Ms. Cage solicited Alchem's customers to start buying liquid nicotine from NAN, and some of her efforts were successful. There is no evidence in the record before the Court to establish what sources Ms. Cage queried to contact potential NAN customers. NAN paid commissions to Ms. Cage based on her sales to companies that Alchem contends were its customers.

After she resigned from her employment with Alchem, Ms. Cage claims to have lost her cellphone. In addition, when she returned her work laptop to Alchem, it was inoperable. NAN asserts that it never conspired with Ms. Cage to access Ms. Cage's company-issued phone, laptop, or any of Alchem's computers, computer systems, or databases. Likewise, NAN contends that it never sought, or had access to, Alchem's property, customer lists, or other confidential business information.

**B.    Procedural History**

On February 28, 2020, almost a year after Ms. Cage resigned, Alchem brought suit against her in the Court of Common Pleas of Philadelphia County. Ms. Cage removed the matter to this Court, and Alchem filed an Amended Complaint against both Ms. Cage and

4

NAN. Relevant here, Alchem asserts claims against Ms. Cage and NAN for misappropriation of trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act (Count IV), tortious interference with existing business relationships (Count V), and intentionally accessing a protected computer in violation of the Computer Fraud and Abuse Act (Count VII).[1] Discovery was scheduled to close on May 28, 2021. Unbeknownst to the Court, the Parties agreed among themselves to extend the discovery deadline to July 23, 2021, despite the fact that dispositive motions were due more than a month earlier, on June 11, 2021. (ECF No. 93 at 44:20-22.)

On June 11, 2021, while the Parties were still in the midst of discovery, NAN filed a Motion for Summary Judgment on each of the three claims that Alchem asserted against it. Alchem responded by pointing to documents that it apparently had not produced before the summary judgment deadline. The Court held a hearing on the Motion on July 28, 2021. At the hearing, the Court learned about the Parties' agreed-upon extension of discovery. The Court also asked Alchem's counsel to identify the trade secrets that Alchem contends that Ms. Cage and NAN misappropriated. Alchem's counsel represented that Alchem contends that Ms. Cage and NAN misappropriated: 1) Salesforce data; 2) customer lists derived from Salesforce; 3) invoices that reveal prices and customer contact

---

[1]     Alchem asserts additional claims against Ms. Cage only, none of which are at issue in the present motions. Likewise, Alchem's claim against Ms. Cage for tortious interference with prospective and existing business relationships set forth in Count V of the Amended Complaint is based on different conduct involving customer relationships.

information; 4) certificates of analysis; and 5) email communications that reveal Alchem's business information, pricing, and targeted markets. (ECF No. 93 at 10:9 – 13:6.)

Because the Parties were still exchanging discovery while dispositive motions were being briefed, Alchem had not yet produced discovery related to these alleged trade secrets. In fact, Alchem did not even mention most of these trade secrets in its opposition to NAN's Motion for Summary Judgment. As a result, the Court denied the Motion without prejudice and granted the Parties leave to re-file dispositive motions. However, the Court made clear that the Parties could not take any further discovery and that any absence of proof on these issues was a result of the Parties' unilateral amendments to the Court's Scheduling Order. (ECF No. 93 at 44:20 – 45:1; ECF No. 91 at ¶ 2.) The Court also ordered that Alchem was barred from asserting any additional trade secrets other than those that Alchem's counsel had identified on the record during the hearing.

On August 11, 2021, NAN filed a renewed Motion for Summary Judgment seeking partial summary judgment in her favor. Ms. Cage has joined that motion. Alchem has opposed both motions and attached a report from Salesforce as an exhibit to its Opposition. Alchem filed a Motion to Seal that exhibit, which the Court denied. However, Alchem has moved for reconsideration of that decision, and all three motions are ripe for disposition.

## II.      MOTION FOR SUMMARY JUDGMENT

### A.      Legal Standard

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). "If a party fails to . . . properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion; [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2)-(3).

**B.     Violation Of Pennsylvania's Uniform Trade Secrets Act**

Pennsylvania's Uniform Trade Secrets Act prohibits the misappropriation of trade secrets. A trade secret is information, including a "compilation" such as a "customer list," that (1) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (2) is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 Pa. C.S.A. § 5302. "Misappropriation" includes both (1) "acquisition of a trade secret . . . by a person who knows or has reason to know that the trade secret was acquired by improper means" or (2) "disclosure or use of a trade secret" by someone who used improper means to acquire the trade secret, knew it was obtained improperly, or knew it was acquired under circumstances giving rise to a duty to maintain its secrecy. 12 Pa. C.S.A. § 5302.

"Whether information rises to the level of a trade secret under PUTSA is a question of fact." *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 705 (E.D. Pa. 2014) (citation omitted). To make this determination, the finder of fact considers factors such as: "1) the extent to which the information is known outside of [the] business; 2) the extent to which it is known by employees and others involved in [the] business; 3) the extent of measures taken ... to guard the secrecy of the information; 4) the value of the information to [the business] and to [its] competitors; 5) the amount of effort or money expended ... in developing the information; and 6) the ease or difficulty with which the information could

be properly acquired or duplicated by others." *Crum v. Bridgestone/Firestone N. Am. Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. Ct. 2006). "[I]nformation will not necessarily be deprived of protection as a trade secret because parts of it are publicly available. A confidential compilation and organization of public information can amount to a trade secret. 'Courts have long recognized that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'" *Mallet & Co. Inc. v. Lacayo*, No. 20-3584, --- F.4th ----, 2021 WL 4810168, at *15 (3d Cir. Sept. 24, 2021) (quotation omitted).

Alchem points to five types of trade secrets that it contends Ms. Cage and NAN misappropriated: 1) Salesforce data; 2) customer lists derived from Salesforce; 3) invoices that reveal prices and customer contact information; 4) certificates of analysis; and 5) email communications that reveal Alchem's business information, pricing, and targeted markets. Even if these materials could rise to the level of protected trade secrets, Alchem has no evidence that Ms. Cage or NAN misappropriated any of them.

### 1.    Salesforce

It is possible that Alchem's customer database, Salesforce, and the compilation of data within it constitutes a trade secret under Pennsylvania law. *See Mallet & Co.*, 2021 WL 4810168, at *15; *Synthes*, 25 F. Supp. 3d at 706; *see also Advanced Rsch. Sys., Inc. v. ColdEdge Techs., Inc.*, No. 3253 EDA 2012, 2014 WL 10979726, at *7 (Pa. Super. Ct. Mar.

21, 2014). However, there is no evidence in the record that Ms. Cage used improper means to acquire data from Salesforce or used or disclosed information from the database. For example, Alchem has no evidence that Ms. Cage logged into Salesforce during the time after she accepted a position with NAN. On the contrary, there is evidence that Ms. Cage "did not like" Salesforce and "rarely accessed it" during her employment. (ECF No. 95-7 at ¶ 3.) While Ms. Cage admits to soliciting Alchem's customers for NAN's benefit, there is no evidence that she used Salesforce or the compilation of data within it to do so. In fact, the record is silent as to how Ms. Cage went about soliciting these customers.

### 2. Customer lists

Alchem is not specific about what customer lists it thinks Ms. Cage accessed. If Alchem just means a list of individual customer contacts, without more, that information does not qualify as a trade secret under the Act because "[a]n employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secrets." *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 452 (E.D. Pa. 2014) (quoting *BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*, 791 F. Supp. 489, 546 (E.D. Pa. 1992)). Those personal business contacts are just a modern version of a Rolodex; they do not morph into trade secrets just because those same contacts also appear on an employer's mailing list or in its correspondence files. *BIEC Int'l*, 791 F. Supp. at 546. That would be true even if the same information also resides in Salesforce.

10

Alchem seems to argue that every business contact that Ms. Cage made while working for Alchem is a trade secret because Ms. Cage had no experience or contacts in the liquid nicotine industry before coming to work for Alchem. But that argument stretches the concept of a trade secret too far. A comprehensive list of customers, with information about their buying habits, might qualify, but mere contact information saved in a phone, listed on a spreadsheet, or saved in iCloud does not. If Alchem means to suggest that Ms. Cage accessed some more detailed customer list, such as a detailed report from Salesforce, it has not offered any evidence that such a list existed, let alone that Ms. Cage acquired, used, or disclosed information from such a list after she accepted NAN's offer.

### 3. Invoices

Alchem contends that the invoices it sends to customers contain information like product pricing that it considers to be trade secrets. As an initial matter, it is not clear that the price Alchem charges customers for liquid nicotine would constitute a protected trade secret under Pennsylvania law. *See Synthes*, 25 F. Supp. 3d at 706 ("Courts have also recognized that prices charged are not protectible because they can be obtained by the customer.") (citations omitted). In any event, even if the invoices contained trade secrets, Alchem's claim would still fail because there is no evidence in the record that Ms. Cage improperly acquired any invoices or used or disclosed any of their contents after she accepted NAN's offer.

### 4.      Certificates of analysis

According to Alchem, certificates of analysis indicate the specific lab-rated qualities of Alchem's products. No evidence anywhere in the record suggests that Ms. Cage improperly acquired certificates of analysis or used or disclosed them in any way.

### 5.      Email communications

Alchem contends that throughout the course of her employment with Alchem, Ms. Cage received emails that contained Alchem's trade secrets, such as product pricing and information relative to the properties and formulations of Alchem's liquid nicotine products. Again, even if that were true, there is no evidence in the record to support Alchem's assertion that Ms. Cage used or disclosed any of that information. Alchem has not shown that Ms. Cage looked at a single email in connection with her solicitation of customers after she accepted NAN's offer, let alone that she looked at an email that contained trade secret information.

*      *      *

Absent any evidence that Ms. Cage improperly acquired, used, or disclosed Alchem's trade secrets, Alchem cannot maintain its misappropriation claim against her, nor can it maintain a claim against NAN on a theory of vicarious liability. Alchem asks the Court to assume that Ms. Cage must have accessed "the vast body of information contained within Salesforce, it's [sic] invoices, certificates of analysis, or the myriad emails to which Ms. Cage was privy." (ECF No. 98-1 at 15.) But it has no evidence that she did so,

12

and it is just as likely that Ms. Cage just scrolled through the list of contacts on her phone or in iCloud and made phone calls following that. To survive summary judgment, Alchem needs at least some piece of evidence suggesting that Ms. Cage did something improper.

Alchem also tries to avoid the lack of evidence of use or disclosure by invoking the inevitable disclosure doctrine. However, that doctrine has no application here. That doctrine reflects Pennsylvania's standard for granting injunctions in trade secret cases and permits a court to enjoin a defendant "from engaging in employment or certain aspects of his employment where that employment is likely to result in the disclosure of information, held secret by a former employer, of which the employee gained knowledge as a result of his former employment situation." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110–11 (3d Cir. 2010) (quotation omitted). The standard governs preliminary injunctions where there is a threatened misappropriation of trade secrets; as such, it has no application here. It is also not an evidentiary presumption or a mandatory adverse inference that relieves a plaintiff of its burden to prove that actual misappropriation of trade secrets occurred. Without such evidence, Alchem cannot prevail on its misappropriation claims, regardless of whether the information at issue amounts to a trade secret.

### C.   Violation Of Computer Fraud And Abuse Act

To prevail on its CFAA claim against Ms. Cage, Alchem must prove that Ms. Cage accessed Alchem's protected computers without authorization or that she exceeded her

authorized access. *See* 18 U.S.C. §§ 1030(a)(2), (4). It must also prove that NAN participated, either directly or indirectly. Ms. Cage's Alchem-issued cell phone and computer constitute protected computers, and NAN does not argue otherwise. But Alchem has not offered any evidence from which a juror could find that Ms. Cage accessed those computers without authorization or that NAN participated in any conduct.

### 1.      Unauthorized access

The CFAA "covers those who obtain information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend. It does not cover those who ... have improper motives for obtaining information that is otherwise available to them." *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021). Those limits apply because Congress meant for the CFAA to prohibit unauthorized *entry* into computer systems (*i.e.*, hacking), as opposed to the unauthorized *use* of information stored on those systems. *See id.* at 1658-59; *see also United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) ("[The CFAA's] ... general purpose is to punish hacking— the circumvention of technological access barriers—not misappropriation of trade secrets—a subject Congress has dealt with elsewhere."). Thus, the statute "does not ensnare a person who was authorized to obtain information in the computer, but was not authorized to use it the way she did." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 670 (E.D. Pa. 2018). Under these principles, Alchem cannot show that Ms. Cage

accessed Alchem's computers without authorization, either during the time when Ms. Case worked for both Alchem and NAN or after.

*First*, during the time that Ms. Cage worked for both Alchem and NAN, Alchem admits that it authorized Ms. Cage to utilize both her phone and her computer to perform her job. (ECF No. 91-1 at 22.) Ms. Cage did not access parts of Alchem's computer network beyond that to which Alchem's authorization extended. And the Supreme Court's decision in *Van Buren* means that the CFAA does not apply even if she used her Alchem-issued devices or accessed Alchem's network for some improper purpose. *See Van Buren*, 141 S.Ct. at 1662 (defendant who had access to employer's database did not exceed authorized access under the CFAA even though the defendant obtained information from the database for an improper purpose).

*Second*, Alchem offers no evidence that Ms. Cage used either device after her resignation. Nor is there a reason for the Court to presume that Ms. Cage used either device to access Alchem's computer systems after she resigned. Alchem admits that it has no evidence of Ms. Cage's access of its devices and systems during this time, but it blames this failure of proof on Ms. Cage's loss of her phone and the inoperability of her computer when she returned it. If Alchem had sufficient evidence of spoliation, "it was incumbent upon [Alchem] to seek redress through an appropriate discovery motion." *Ferrone v. Onorato*, No. 05-cv-303, 2007 WL 2973684, at *10 (W.D. Pa. Oct. 9, 2007), *aff'd*, 298 F.

App'x 190 (3d Cir. 2008).[2] Alchem did not do so. Instead, it made a passing reference to spoliation in its Opposition and told the Court that it would wait to file a motion on the issue and/or submit jury instructions seeking an adverse inference until a later date. (ECF No. 98-1 at 23 n.8.) But spoliation is a serious matter, and the Court "cannot now resolve such a serious accusation through its consideration of papers submitted in opposition to summary judgment . . .." *Ferrone*, 2007 WL 2973684. Alchem's spoliation allegations are untimely. In any event, even if the Court could consider Alchem's spoliation claim, the Court would not presume that the evidence would be unfavorable to Ms. Cage because Alchem has failed to demonstrate that Ms. Cage acted with the intent to deprive Alchem of the information's use in this litigation. *See Arana v. Temple Univ. Health Sys.*, 776 F. App'x 66, 70-71 (3d Cir. 2019) (quotations omitted).

## 2. NAN's participation

Alchem cannot prove that NAN accessed Alchem's computers directly or indirectly. Its direct access argument rests on its argument that NAN is vicariously liable for Ms.

---

[2]     *See also Harden v. Stangle*, No. 18-cv-981, 2020 WL 6685525, at *6 (M.D. Tenn. Nov. 12, 2020), *appeal dismissed*, No. 20-cv-6357, 2021 WL 837059 (6th Cir. Feb. 19, 2021) ("Numerous courts have held that a spoliation argument raised solely as a defense to a summary judgment motion, after the close of discovery, is untimely."); *Mannion v. Ameri-Can Freight Sys. Inc.*, No. 17-cv-3262, 2020 WL 417492, at *3 (D. Ariz. Jan. 27, 2020) ("Spoliation is a discovery offense, so issues surrounding alleged spoliation should be resolved during discovery[.]"); *Scalia v. Cty. of Kern*, No. 17-cv-1097, 2020 WL 5959905, at *6 (E.D. Cal. Oct. 8, 2020) ("Courts have also deemed the issue is untimely when the spoliation is not raised until after the close of discovery, or in opposition to summary judgment.").

Cage's alleged conduct. The "Third Circuit has not yet addressed the question of whether a party can sustain a CFAA action on a vicarious liability theory." *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 589-90 (E.D. Pa. 2016). Yet Alchem addresses vicarious liability under the CFAA only in a footnote. (ECF No. 98-1 at 22 n.7.) This Court's Policies and Procedures do not permit parties to make substantive arguments in footnotes. *See* Policies and Procedures, Honorable Joshua D. Wolson, Section II.B.1 ("The Court will not consider substantive arguments made in footnotes, nor will it deem those arguments preserved.").[3] And, although Alchem made vicarious liability arguments in the portion of its Opposition addressing trade secrets, the unsettled nature of a theory of vicarious liability under the CFAA demanded more from Alchem than a single passing reference in a footnote.

For an indirect access claim, Alchem must prove that NAN directed, encouraged, or induced Ms. Cage to access one of Alchem's protected computers that NAN was unauthorized to access. *See Teva*, 291 F. Supp. 3d at 671. NAN's evidence shows that it did not conspire with Ms. Cage and that it did not access or seek access to Alchem's protected computers or systems. (*E.g.*, ECF No. 95-2 at ¶ 4; ECF No. 95-5 at ¶ 21; ECF No. 95-7 at ¶ 5.) Alchem's response rests on NAN's agreement to pay Ms. Cage a commission on sales to new customers. At most, NAN's commission policy encouraged or induced Ms. Cage to attract new customers on NAN's behalf. However, it is not reasonable for the Court to infer that in structuring Ms. Cage's compensation this way, NAN induced Ms.

---

[3]     *Available at* https://www.paed.uscourts.gov/documents/procedures/wolpol.pdf

Cage to access Alchem's protected computers to steal its confidential information. That is not a reasonable inference; it is a logical leap that the Court will not make because "accusations and supposition are insufficient to sustain a cause of action through the summary judgment stage[.]" *Kamran Khan v. Vayn*, No. 13-cv-1294, 2014 WL 550552, at *5 (E.D. Pa. Feb. 12, 2014). Without any actual evidence that NAN directed, encouraged, or induced Ms. Cage to access Alchem's protected computers on NAN's behalf, Alchem cannot prevail on its claim against NAN for indirect access under the CFAA.

### D.    Tortious Interference With Contractual Relationship

To prevail on its claim against NAN for tortious interference with Ms. Cage's confidentiality agreements, Alchem must prove the following elements:  "(1) the existence of a contractual ... relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation ...; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004) (quotation omitted). "For a defendant to have specific intent to harm a contractual relationship, it must first have knowledge of that contractual relationship." *Acclaim Sys., Inc. v. Infosys, Ltd.*, 679 F. App'x 207, 211 (3d Cir. 2017); *see also Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013)).

NAN has attested that, when it hired Ms. Cage in March 2019, it "was not aware that Ms. Cage had a non-disclosure agreement with Alchem." (ECF No. 95-5 at ¶ 19.) Alchem has not offered any evidence suggesting otherwise. Without establishing that NAN knew about Ms. Cage's confidentiality obligations to Alchem, Alchem cannot prevail on its claim against NAN for tortious interference with those obligations. Moreover, simply agreeing to pay Ms. Cage a commission on sales to new customers would not constitute purposeful interference. Thus, NAN is entitled to summary judgment on this claim.

## III.    MOTION FOR RECONSIDERATION

### A.    Legal Standard

A court may reconsider a prior ruling only if the moving party shows (1) an intervening change in the controlling law, (2) the availability of new evidence that was not available when the court issued its order, or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *See Kelly v. RealPage, Inc.*, Case No. 2:19-cv-1706-JDW, 2021 WL 37722, at *2 (E.D. Pa. Jan. 5, 2021) (citation omitted). Courts should only grant reconsideration "sparingly." *Id.* A motion for reconsideration may not be used to give a litigant a "second bite at the apple" on an argument on which it did not prevail the first time. *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1231 (3d Cir. 1995). Likewise, a motion for reconsideration is not a vehicle for presenting new issues or arguments "that inexcusably were not presented to the court in the matter previously decided." *Minatee v. City of Philadelphia*, No. 09-cv-3016, 2015 WL 1137639, at *2 (E.D. Pa. Mar. 12, 2015).

Mere disagreement or displeasure with a court's decision "does not translate into the type of clear error of law which justifies reconsideration of a ruling." *Haymaker v. Reliance Standard Life Ins. Co.*, No. CV 15-06306, 2016 WL 3258439, at *2 (E.D. Pa. June 14, 2016) (quotation omitted). Rather, to satisfy this standard, a party seeking reconsideration "must establish 'an error ... that is direct, obvious, [ ] observable' and 'apparent to the point of being indisputable.'" *Id.* (same). That is, "the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it." *Id.* (same).

### B.    Analysis

Alchem has not offered a basis for the Court to reconsider its prior order denying the Motion to Seal. It does not point to any new evidence, change in law, or legal error as a basis for reconsideration. Instead, it claims injustice. When Alchem sought leave to file Exhibit 10 to its Opposition under seal, it made no effort to satisfy its burden to persuade the Court to seal the exhibit. It did not explain why Exhibit 10 was a trade secret, nor did it explain what harm would come from its public disclosure. It did not even cite the applicable legal standard. Instead, it admits that it "presupposed that the facts and arguments contained in [its summary judgment] Opposition would be included and referenced for the purposes of the analysis of Alchem's Motion for Seal." (ECF No. 101-3 at 5 n.2.) That type of conduct—treating a motion to seal as an afterthought—has led the Court to deny motions to seal several times, and this case is no different. *See Kivett v.*

*Neolpharma, Inc.*, Case No. 2:20-cv-00664-JDW, 2021 WL 1209844, at * 1 (E.D.Pa. Mar. 31, 2021).

Alchem's reconsideration motion tries to make the showing that Alchem should have tried to make when it first filed its sealing motion. That is, Alchem wants a do-over. Alchem has not shown that the public disclosure of Exhibit 10—a static report derived from Salesforce—will cause a manifest injustice. The common law presumes that the public has a right of access to judicial materials. *See In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). To overcome that presumption, a movant must show that an interest in secrecy outweighs the presumption by demonstrating that the material is the kind of information that courts will protect **and** that disclosure will work a clearly defined and serious injury to the party seeking closure. *See id.* The injury prong requires a party seeking to file material under seal to make a specific showing; "[b]road allegations of harm, bereft of specific examples or articulated reasoning, are insufficient." *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001). It is true that "an interest in safeguarding a trade secret may overcome a presumption of openness." *In re Avandia*, 924 F.3d at 673 (quotation omitted). And the Court will assume (for purposes of resolving the Motion for Reconsideration only) that the Salesforce data in Exhibit 10 constitutes Alchem's trade secrets. But Alchem has not shown a clearly defined, serious injury.

According to Alchem, if Exhibit 10 becomes public, "all confidentiality and competitive value attributable to the trade secrets therein will be irredeemably and irrevocably lost." (ECF No. 101-3 at 8.) This attorney argument is not a specific, clearly-defined injury that warrants the Court shielding information from public view. Salesforce is a dynamic database, and its value comes in part from that dynamism. *See Synthes*, 25 F. Supp. 3d at 706; *see also* ECF No. 98-7 at ¶ 14. Exhibit 10 is a report that Alchem generated from that database. It contains information that Alchem might treat as confidential. But Alchem has not made any showing about how its competitors might use the data in that report to Alchem's disadvantage.

The Court would likely hold that Alchem's failure in this regard does not satisfy its burden to seal Exhibit 10 in the first instance. But the Court does not need to go that far. Instead, it need only conclude that Alchem has not carried the heavier burden of showing that a manifest injustice will result if the Court does not reconsider its prior ruling. It has not overcome that heavy burden to show that this is the sparing type of case warranting reconsideration.

## IV.    CONCLUSION

Alchem cannot prevail on its claims against Ms. Cage and NAN for misappropriation of trade secrets, violations of the CFAA, or tortious interference with Ms. Cage's confidentiality obligations, so the Court will enter summary judgment on each of those claims. Likewise, Alchem has not met its burden to demonstrate that the Court

should reconsider its prior Order denying Alchem's motion to file some of its alleged trade secrets under seal. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

Date:  October 21, 2021